## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| RESHAWN ARMSTRONG, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | 7:17-cv-01857-LSC |
| WILLIAM P. BARR, | ) ) ) | |
| Defendant. | ) ) ) ) ) | |

### MEMORANDUM OF OPINION

Plaintiff Reshawn Armstrong has brought this action *pro se* against United States Attorney General William P. Barr, alleging that she faced sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*[1] Before the Court are Defendant's motion for summary judgment (doc. 93) and Plaintiff's motions for sanctions and judicial notice of certain facts and documents (docs. 96 & 97). The motions have been briefed and are ripe for

---

[1] Plaintiff initially brought this action against former Attorney General Jeff Sessions (doc. 1) and later against acting Attorney General Matthew G. Whitaker (doc. 59). Attorney General William P. Barr now acts as the defendant in this action. (*See* doc. 65); *see also* FED. R. CIV. P. 25(d) (stating that, where a public officer is sued in his official capacity and later ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party"). Accordingly, the Clerk is DIRECTED to add William P. Barr to the style of this action.

review. For the reasons stated below, Defendant's motion for summary judgment (doc. 93) is due to be granted and Plaintiff's motions (docs. 96 & 97) are due to be denied.

## I. BACKGROUND[2]

### A. PLAINTIFF'S WORK AND DISCIPLINARY HISTORY

In 2007, Plaintiff became employed with the Federal Bureau of Prisons ("BOP") as a correctional officer ("CO"). (Def's Ex. A at 82–84.) She remains employed with the BOP at this time.

She transferred to FCI Aliceville in 2012. (*Id.* at 92.) FCI Aliceville is a female institution located in Pickens County, Alabama. (Pl's Ex. H.) At the time of Plaintiff's arrival, the facility was new, and Plaintiff spent the first several months helping to prepare for the arrival of inmates. (Def's Ex. A at 92–93.) When inmates first arrived in January 2013, Plaintiff worked in the camp, supervising inmates and ensuring that they did not have contraband. (*Id.* at 93–94.) During 2014, she worked

---

[2]     The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . ." (internal quotations omitted)).

in visitation. (*Id.* at 96.) In late 2014, and until March 2016, she worked at the rear

gate of the facility, interacting with both inmates and fellow COs as they entered and

exited. (*Id.* at 96–97.) In March 2016, she transferred to the mobile patrol unit, and

she has remained in that position through the time of this action. (*Id.* at 147–48.)

Since transferring to FCI Aliceville, Plaintiff has earned several designations

and awards related to her work. Prior to 2015, she took the Basic Prisoner Transport

("BPT") certification course and maintained that certification until 2015. (*Id.* at 87.)

Although other female correctional officers were similarly certified during that

period, the number was low enough that female officers "were begging to take the

course." (*Id.* at 87–88.) Furthermore, Plaintiff received two incentive awards, one

on March 6, 2015 and the other on May 21, 2015. (Pl's Ex. C.)[3] Finally, between 2012

and 2016, Plaintiff received numerous "excellent" and "outstanding" ratings in her

yearly evaluations. (Pl's Ex B.) Her yearly evaluation for 2015 was signed by

Associate Warden Sekou Ma'at. (*Id.*)

Prior to May 31, 2013, Plaintiff entered a relationship—and began co-

---

[3]     Defendant argues that the award received by Plaintiff on March 3, 2015 is categorized as "Individual cash award NRB [not rating-based]" and therefore not an incentive award. (Doc. 95 at 3.) To support this argument, Defendant cites a webpage for the federal Office of Personnel Management. *See* OPM Chap. 29 at 9 n.3, available at https://www.opm.gov/policy-data-oversight/data-analysis-documentation/personnel-documentation/processing-personnel-actions/gppa29.pdf. However, examination of Defendant's cited source indicates that Plaintiff's first award, though not based on a rating of record, was still based on her contribution to the prison. *See id.* at 9.

habiting—with BOP co-worker Malinda Belton. (Def's Ex. A at 12–13.) On May 31, 2013, the two engaged in a domestic dispute, and police arrested them for domestic violence. (*Id.* at 14; Def's Ex. H at BOP_001917.) Plaintiff's domestic violence charges were dropped in 2013, and her arrest was expunged in 2015. (Def's Ex. A at 57.)

Plaintiff timely reported her arrest to FCI Aliceville, and Warden Arcola Washington Adduci then reported the incident to the Office of Internal Affairs ("OIA"). (Def's Ex. A at 19; Def's Ex. H at BOP_001907.) The OIA launched an investigation into the matter, but it did not submit its investigative report until September 12, 2016. (Def's Ex. H at BOP_001907.) Thus, the investigation remained open throughout 2015, although Plaintiff did not know of the investigation's status until after she had filed her Equal Employment Opportunity ("EEO") complaint in late 2015. (Pl's Ex. H at ¶ 31.) Following the investigation, Captain Chandra Nelson recommended that Plaintiff face three days' suspension for "Discreditable Behavior." (Def's Ex. H at BOP_001900.) Ultimately, in consideration of Plaintiff's acceptable performance and lack of prior discipline, Warden Patricia Bradley ordered on February 3, 2017 that a temporary letter of reprimand be placed in her personnel file. (Pl's Ex. N.)

### B. PLAINTIFF'S JOB APPLICATIONS AND REFERENCE CHECKS

In March 2015, Plaintiff began to apply for positions at other BOP facilities. (Pl's Ex. H.) Early in this process, Plaintiff spoke with Associate Warden Ma'at and informed him that she was applying for other positions. (Def's Ex. A at 188.) At that time, she asked Ma'at whether she could do anything to improve her chances of being promoted elsewhere. (*Id.* at 190.) Ma'at told her that, in addition to working at the rear gate, she should work at other positions where people would be able to see her skill level. (Def's Ex. G at 9.) He also recommended that she apply for a lieutenant's position at FCI Aliceville. (Def's Ex. A at 198.) He told her that she was an excellent worker and that FCI Aliceville, being a female prison, needed more female employees. (*Id.* at 190.) During this conversation, Ma'at also remarked that Plaintiff's BPT certification and her status as a black female made her a valuable employee. (*Id.* at 191.) Despite Ma'at's request, Plaintiff chose not to apply for a lieutenant's position at FCI Aliceville. (*Id.* at 192.)

Plaintiff applied for several BOP positions around the country. For each of her applications, Plaintiff was considered in the "Best Qualified" ("BQ") group. (Def's Ex. D; Pl's Ex. H.) Placement in the BQ group does not mean that the candidate is the best qualified of all candidates or that she is guaranteed to be chosen. (Def's Ex. D at 2.) Instead, it means that the applicant possesses the minimum qualifications

for a given position and scored above the competitive group average score. (*Id.*) Selecting officials may select any applicant from the BQ group, fill the position through some other type of placement action, or decide to leave a position unfilled. (*Id.*)

During the application process, a handful of individuals at FCI Aliceville completed reference checks on behalf of Plaintiff. These reference checks asked for a rating of Plaintiff's skills and a recommendation of whether the individual reference would employ Plaintiff in the open position. (Pl's Ex. G.) Most significantly, the reference checks also asked the individual reference to provide any "Disciplinary Actions [taken against applicant] within last two years, if known." (*Id.*) In the course of conducting a reference check, it is not inappropriate to inquire into a pending disciplinary investigation. (*See* Def's Ex. I at Section 335.7.)[4]

When Plaintiff applied for a lieutenant's position in Honolulu, Hawaii, Warden Adduci completed her reference check on March 30, 2015. (Pl's Ex. G.) On that reference check, Warden Adduci rated all of Plaintiff's skills as "above average"

---

[4]    Admittedly, the Program Statement for the BOP's Diversity Management and Affirmative Employment Programs indicates that it is inappropriate to inquire into "any investigations" during a reference check. (Pl's Ex. D at Section 17.) However, those guidelines specifically establish "procedures for the recruitment and hiring of persons *with disabilities*." (*Id.*) (emphasis added). Because Plaintiff does not allege to have a disability, those guidelines are inapposite, and the BOP's general hiring guidelines (Def's Ex. I at Section 335.7) control.

and answered that she would employ Plaintiff in that position. (*Id.*) However, in response to the question asking for any disciplinary actions against Plaintiff, Warden Adduci answered "Open Case." (*Id.*)

Associate Warden Ma'at also completed a reference check for Plaintiff's application to the Honolulu position on April 1, 2015. (*Id.*) On this reference check, Ma'at rated all of Plaintiff's skills as "average," and he answered "yes" to the question of whether there had been any disciplinary actions taken against Plaintiff in the last two years. (*Id.*) However, Ma'at answered that he would employ Plaintiff for the position in question. (*Id.*) Ultimately, a male applicant was selected to fill the Honolulu position. (*Id.*)

After she was rejected for the Honolulu position, Plaintiff met with Warden Adduci to discuss her reference check. (Def's Ex. A at 201–02.) At that meeting, Warden Adduci did not provide any reason for why she answered "Open Case" when asked about Plaintiff's disciplinary history. (*Id.*) Plaintiff recalls only that Warden Adduci told her that it wasn't "[Plaintiff's] time yet to promote." (*Id.*)[5]

When Plaintiff applied for a correctional counselor's position in Mendota, California, Associate Warden Ma'at completed her reference check on April 3, 2015.

---

[5]     Warden Adduci has no recollection of this meeting and denies that she ever spoke with Plaintiff regarding the reference checks. (Def's Ex. B at 4.)

(*Id.*) On this reference check he rated each of Plaintiff's skills as "Average" or "Not Observed" and answered "yes" to the question regarding disciplinary actions. (*Id.*) Again, Ma'at also answered that he would employ Plaintiff in that position. (*Id.*) The selected candidate for this position was Rosemary Yniquez, a female. (Def's Ex. D at 3.)

Plaintiff also applied for a lieutenant position in Lompoc, California, and an unknown individual completed her reference check on April 23, 2015. (Pl's Ex. G.) This individual rated each of Plaintiff's skills as "Average," answered "None" to the question involving previous disciplinary actions, and affirmed that she would employ Plaintiff for the position. (*Id.*) However, a male candidate was selected to fill this position. (*Id.*)

Plaintiff next applied for a lieutenant position in San Diego, California, and an unknown individual completed her reference check on May 8, 2015. (*Id.*) In rating Plaintiff's skills, this individual answered most of the listed skills by marking the line that separates the boxes labeled "Average" and "Above Average." (*Id.*) The individual denied that Plaintiff had any recent disciplinary issues and answered that she would employ Plaintiff in that position. (*Id.*) However, Plaintiff was not selected for the position. (Def's Ex. A at 229–30.)

Associate Warden Margaret Reherman completed Plaintiff's next reference

check on June 9, 2015. (Pl's Ex. G.) When rating Plaintiff's skills, Reherman marked the boxes for both "Average" and "Above Average" on each skill. (*Id.*) Nevertheless, Reherman denied that Plaintiff had any disciplinary issues and answered that she would employ Plaintiff in the position. (*Id.*) As with all her applications, Plaintiff was not selected for this position. (Def's Ex. A at 229–30.)

Plaintiff next applied for a correctional counselor position in Big Spring, Texas, and Associate Warden Ma'at completed her reference check on July 7, 2015. (Pl's Ex. G.) On this reference check he rated each of Plaintiff's skills as "Average" or "Not Observed" and answered "yes" to the question regarding disciplinary actions. (*Id.*) In response to a question asking whether he would employ Plaintiff in that position, Ma'at did not mark an answer. (*Id.*) The selected candidate for this position was Randolph King, a white male co-worker at FCI Aliceville who received no reference check from Ma'at. (Def's Ex. D at 3.)

Plaintiff also applied for a unit counselor position at FCI Phoenix, and Ma'at completed her reference check on July 30, 2015. (Pl's Ex. G.) Ma'at's answers in this reference check mirrored those in his reference check for Plaintiff's Big Spring application except that he affirmatively recommended employing Plaintiff on this reference check. (*See id.*) Ultimately, decisionmakers did not rely on the BQ list in filling the Phoenix position, and no one from the BQ list on which Plaintiff appeared

was chosen. (Def's Ex. D at 2.)

Finally, Ma'at provided yet another reference check for Plaintiff on September 15, 2015. (Pl's Ex. G.) This time, Ma'at rated Plaintiff's skills as either "Average" or "Above Average" and indicated that he did not know of any disciplinary actions taken against Plaintiff. (*Id.*) Again, Ma'at answered that he would employ Plaintiff in the vacant position. (*Id.*) As with the positions to which Plaintiff applied in 2015, she was not selected for this position. (Def's Ex. A at 229–30.)

Plaintiff's unsuccessful attempts to transfer or promote out of FCI Aliceville came at a time when the facility was attempting to hire more female COs. The Prison Rape Elimination Act, 42 U.S.C. § 30301, *et seq.*, limits the ways that male COs may physically interact with female inmates, prohibiting male COs from conducting pat-searches of female inmates. (Doc. 26 at 10.) There is evidence that, in 2014 and 2015, FCI Aliceville's management was sending two male COs on routine scheduled medical trips for female inmates without the presence of female staff. (Pl's Ex. H at ¶ 9.) In early 2016, FCI Aliceville's human resources department shut down for two days to conduct mass job interviews and fill vacant positions. (Pl's Ex. A.) However, by July 2016, FCI Aliceville employed approximately 117 female staff. (Def's Ex. B at 7.) And although Plaintiff was unsuccessful in her efforts, other female COs

succeeded in transferring or promoting out of FCI Aliceville. (Def's Ex. D at 3.)

## C. PLAINTIFF'S EEO COMPLAINT AND SUBSEQUENT TREATMENT

After failing to transfer or promote out of the facility, Plaintiff contacted the EEO office on August 21, 2015. (Def's Ex. A at 287.) On September 11, 2015, she filed an informal EEO complaint, alleging sex discrimination and disparate treatment. (Pl's Ex. H at ¶ 20.) She later amended this complaint to include retaliation as well. (*Id.* at ¶ 27.) On December 1, 2015 she filed her formal EEO complaint, which added allegations involving her annual leave and pay. (*Id.* at ¶ 30.) These additional allegations arose from incidents occurring following her initial meeting with the EEO office on August 21, 2015.

On September 8, 2015, a sudden scheduling change prevented Plaintiff from receiving her "in lieu of holiday" day off for that month. (Def's Ex. A at 270–71.) After Plaintiff complained of the scheduling change, the scheduling roster was retroactively altered to list Plaintiff as being assigned to work for overtime pay on her scheduled day off. (*Id.*) Plaintiff filed a formal grievance, but the matter was never resolved. (*Id.* at 272.)

On October 8, 2015, a confrontation arose between Plaintiff and another CO, Demetrius Heatrice. (*Id.* at 299.) Heatrice and an escort officer brought a truck to the rear gate to make a delivery. (*Id.*) Policy dictated that the truck could not leave

without the same escort officer present, but Heatrice attempted to exit with a different escort officer. (*Id.*) Plaintiff refused to permit the truck to exit without the same escort officer present, and a frustrated Heatrice yelled "We all wear blues here." (*Id.* at 300.) Plaintiff attempted to ignore him by returning to her office. (*Id.*) After Heatrice followed her and continued to yell angry remarks, Plaintiff felt physically threatened and chose to head back outside where there were cameras. (*Id.* at 304.) However, Heatrice blocked the door and demanded that she answer him. (*Id.* at 301.) At no point during this confrontation did Heatrice refer to Plaintiff's sex or her EEO complaint. (*See id.* at 312.)

Following their initial confrontation, Plaintiff encountered Heatrice numerous times when the latter would come to make a delivery at the rear gate. (*Id.* at 306–07.) In these encounters, Heatrice deliberately acted abrasive and refused to acknowledge Plaintiff as she performed her inspections. (*Id.* at 306.) However, Heatrice did not again exhibit the same aggressive behavior that he had used on October 8, 2015. (*Id.* at 308–09.)

On October 14, 2015, Plaintiff had a separate confrontation at the rear gate with fellow CO Jason Hudson. (*Id.* at 100–01; Def's Ex. I.) Hudson approached the rear gate in his personal vehicle and demanded that Plaintiff open the gate. (Def's Ex. A at 101.) Based on facility policy discouraging employees from using the rear

gate as a main entrance, Plaintiff refused. (*Id.*) Hudson remained at the rear gate for about fifteen minutes, hitting the gate and screaming for Plaintiff to open it. (*Id.* at 121.) He made no mention of Plaintiff's status as a female or any EEO complaint that she had brought. (*Id.* at 123.) Plaintiff did not feel physically threatened by Hudson's outburst and simply waited in her office for him to leave. (*Id.* at 298.) Following this confrontation, Plaintiff had no other negative contact with Hudson. (*Id.* at 146.)

Plaintiff alerted superiors about her issues with Officers Heatrice and Hudson. On October 14, 2015, she sent a memorandum to FCI Aliceville Management concerning Heatrice. (Doc. 26 Ex. 20.) On November 27, 2015, she sent a memorandum to Warden Adduci concerning Hudson. (Def's Ex. I.) In neither instance did her superiors conduct a threat assessment in response to Plaintiff's concerns, nor did they speak directly with Plaintiff. (Def's Ex. A at 144, 310–11.)[6]

On October 30, 2015, Plaintiff faced a reduction in her accumulated annual leave hours despite spending the day at a work-related training event. On that date, she attended a required firearms training session at a location separate from FCI Aliceville. (Pl's Ex. H at ¶ 28.) Plaintiff had previously scheduled to have that day off from work and to be paid from her accumulated annual leave hours. (Def's Ex. A

---

[6]     Warden Adduci does not recall whether she sent supervising officers to address these specific concerns at the rear gate, but she does recall sending supervising officers to the rear gate on multiple occasions when conflicts with Plaintiff arose. (Def's Ex. B at 5–6.)

at 281.) She changed those plans after being informed that October 30 would be the last opportunity for her to attend the required training session. (*Id.*) Although the session was work-related, Plaintiff later discovered a ten-hour reduction from her accumulated annual leave on that same date. (*Id.* at 280.) Plaintiff complained to her superiors about the reduction, but the matter remains unresolved. (*Id.* at 283–84.) Notably, she did receive pay from her accrued annual leave on that date. (*Id.* at 281–82.)

Finally, Plaintiff did not receive overtime pay for attending a mediation in this case that was scheduled on November 23, 2015. (*Id.* at 259–60.) The mediation occurred during a week in which Plaintiff was taking leave from work. (*Id.* at 260.) Plaintiff later contacted Kylie Tisdale, FCI Aliceville's Human Resources manager ("HR Manager"), to discuss reimbursement. (*Id.* at 257.) On December 4, 2015, HR Manager Tisdale sent an email to Plaintiff and her superiors, noting that Plaintiff was entitled to two hours of overtime pay. (*Id.* at 257–58; Doc. 26 Ex. 22.) Nonetheless, Plaintiff did not receive overtime wages for her attendance at the mediation. (Doc. 93 Ex. A at 257–58.) However, she did receive standard reimbursement for use of her annual leave hours that week. (*Id.* at 267.) Including her attendance at the mediation session, Plaintiff did not work more than forty hours during that workweek. (*Id.* at 268.)

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms.*, Inc., 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment."

*Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III. DISCUSSION

### A. PLAINTIFFS' MOTIONS FOR JUDICIAL NOTICE AND SANCTIONS

Before examining Defendant's motion for summary judgment, the Court will first consider Plaintiff's related motions. First, Plaintiff has asked, with little support or explanation, that the Court exercise judicial notice as to numerous facts and documents. (Doc. 97.) Second, she asks that this Court impose sanctions on Defendant based on the latter's behavior in litigating his motion for summary

judgment. (Doc. 96.)

### 1. PLAINTIFF'S MOTION FOR JUDICIAL NOTICE

"A district court may take judicial notice of an adjudicative fact that is both 'not subject to reasonable dispute' and either (1) 'generally known within the trial court's territorial jurisdiction' or (2) 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Grayson v. Warden, Comm'r, Ala. DOC.*, 869 F.3d 1204, 1224–25 (11th Cir. 2017) (quoting FED. R. EVID. 201(b)). Plaintiff has not demonstrated that the exercise of judicial notice would be appropriate in this case. As an initial matter, the forty "Material/Adjudicative Facts of Case" Plaintiff identifies in her motion already exist in the record as part of the "Additional Undisputed Facts" section of Plaintiff's brief in response to the summary judgment motion. (*See* doc. 94 at 19.)[7] In his reply, Defendant has disputed many of these facts. (*See* doc. 95 at 2–6.) Even if these facts were appropriate for judicial notice, Plaintiff may not employ judicial notice as an end run around any factual disputes raised in Defendant's reply.[8] The documents

---

[7]     This Court's Uniform Initial Order lays out the procedure by which each party may designate certain facts as disputed or undisputed for the purposes of summary judgment. (Doc. 5 at 16–18.)

[8]     The Court notes that numerous facts in Plaintiff's motion rely on her own affidavit in support. (*See, e.g.*, doc. 97 at 3 ¶ 2.) Such facts are not "generally known" or able to be "accurately and readily determined" from sufficiently reliable sources. *See* FED. R. EVID. 201. Examination of the remaining facts reveal similar deficiencies throughout.

that Plaintiff included in her motion, however, are not yet a part of the record. Plaintiff has offered no argument as to how any of these documents are relevant to the current proceeding. *Cf. Thompson v. The Fla. Bar*, No. 07-21256-CIV, 2007 WL 4380067, at *1 (S.D. Fla. Nov. 20, 2007) (denying as irrelevant *pro se* plaintiff's motions for judicial notice of various articles taken from the newspaper and the Internet). The Court will not engage in guesswork as to why Plaintiff provides each document. Accordingly, Plaintiff's motion for judicial notice is due to be denied.

### 2. PLAINTIFF'S MOTION FOR SANCTIONS AND A HEARING

Sanctions under Federal Rule of Civil Procedure 11 "are warranted when a party files a pleading that (1) has no reasonable factual basis; (2) is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) is filed in bad faith for an improper purpose." *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998). Plaintiff asserts that Defendant filed his motion for summary judgment in bad faith. Examples of this purported bad faith include (1) falsifying or misstating the facts, (2) citing irrelevant evidence as a means of harassing Plaintiff, and (3) failing to present full arguments regarding each claim and affirmative defense raised in this case.[9]

---

[9] Plaintiff also alleges that Defendant has falsified certain records, including deleting or fabricating portions of her deposition transcript. (Doc. 99 at 4–5.) However, Plaintiff has not provided any evidence in support of this claim, nor has she specified what portions of the transcript she believes were deleted or fabricated.

However, the Court finds that sanctions are not warranted in this case. A review of the docket reveals that Defendant submitted no pleadings to the Court that (1) were not well-grounded in fact and had no reasonable factual basis; (2) were not legally tenable; or (3) were submitted in bad faith or for an improper purpose. Indeed, as discussed further below, Defendant's motion is due to be granted. Accordingly, a hearing is not necessary, and Plaintiff's motion for sanctions is due to be denied.

## B. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Having dealt with Plaintiff's motions, the Court now turns to Defendant's motion for summary judgment. (Doc. 94.) Plaintiff has pending several causes of action including (1) Discrimination under Title VII, (2) Retaliation under Title VII, (3) Hostile Work Environment under Title VII, (4) unpaid wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and (5) a state-law claim for intentional infliction of emotional distress.

### 1. TITLE VII DISCRIMINATION

Plaintiff's first claim asserts unlawful sex discrimination under Title VII. A plaintiff in a Title VII case can establish a claim of intentional discrimination using either direct or circumstantial evidence. *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 854 (11th Cir. 2010). "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any

inference or presumption." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). "If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004).

Plaintiff has not put forth any direct evidence of discriminatory intent. She identifies two statements from her superiors as evidence of discrimination in Plaintiff's reference checks.[10] First, she cites Warden Adduci's statement that it was not yet time for Plaintiff to be promoted. Warden Adduci's statement makes no reference whatsoever to Plaintiff's protected status, and it does not constitute direct evidence of discriminatory intent. Second, Plaintiff cites Associate Warden Ma'at's statement that Plaintiff's status as a BPT-certified, black woman made her a valuable employee at FCI Aliceville, a female institution that needed female employees. Although this statement suggests some discriminatory motive in that Ma'at valued Plaintiff's protected status, it does not prove a motive for hindering Plaintiff's job application efforts. The comment does not relate to the reference checks at issue and is not one of "'the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of' some impermissible factor." *Wilson*, 376 F.3d at

---

[10]     Plaintiff's amended complaint alleges that the pertinent reference checks constituted the discrimination that Plaintiff faced. (Doc. 69 at 17.) Plaintiff has not alleged that her rejection by other BOP facilities constituted a separate act of discrimination. Accordingly, the Court limits its analysis to Plaintiff's reference checks.

1086 (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)).

Absent direct evidence of discrimination, a plaintiff asserting a disparate treatment claim will typically need to satisfy the burden-shifting *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). In exceptional cases, however, a plaintiff may also be able to escape summary judgment if she can otherwise present "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

To establish a prima facie case for disparate treatment in an employment discrimination case, the plaintiff must show that: (1) she is a member of a protected class; (2) she was subject to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job. *Trask v. Sec'y, Dept. of Veterans Affairs*, 822 F.3d 1179, 1192 (11th Cir. 2016).

Plaintiff easily satisfies the first element of her prima facie case. It is undisputed that Plaintiff is a woman and therefore a member of a protected class.

Plaintiff has also shown that she was qualified for the positions to which she applied. To satisfy this element of her prima facie case, a plaintiff must show that she satisfied an employer's objective qualifications. *Vessels v. Atlanta Indep. Sch. Sys.*,

408 F.3d 763, 769 (11th Cir. 2005). "[S]ubjective evaluations play no part in the plaintiff's prima facie case." *Id.* It is undisputed that Plaintiff applied to each position as a member of the BQ group. An applicant within the BQ group meets the minimum qualifications for the position to which she applies. Therefore, Plaintiff has satisfied this element of her prima facie case.

Plaintiff has arguably shown that she suffered an adverse employment action. "[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). Any act—such as a false or negative reference—that "does more than *de minimis* harm . . . to a plaintiff's future employment prospects" may qualify as an adverse employment action for the purposes of a Title VII discrimination claim. *See Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004) (emphasis removed). To be sure, Plaintiff was rejected for each promotion even where her reference checks did not reference any disciplinary action. (*See* Def's Ex. A at 229–30; Pl's Ex. G.) But this fact does not foreclose the reasonable conclusion that Plaintiff's reference checks negatively impacted her promotion prospects. Therefore, there is at least a fact question as to whether Plaintiff suffered an adverse employment action.

Regardless, Plaintiff cannot make out a prima facie case for sex discrimination, because she has failed to present any similarly situated comparators who were subject to different treatment. Under the fourth element of a prima facie case, the comparator and the plaintiff must be "similarly situated in all material aspects." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1226 (11th Cir. 2019) (en banc). Ordinarily a similarly situated comparator: (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff;" (2) "will have been subject to the same employment policy, guideline, or rule as the plaintiff;" (3) "will . . . have been under the jurisdiction of the same supervisor as the plaintiff;" and (4) "will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28 (cleaned up). In her affidavit and deposition testimony, Plaintiff identifies numerous male COs who received promotions over her in this case. Her strongest comparator is Randolph King, a white male co-worker at FCI Aliceville who was selected over Plaintiff for the Big Springs position. However, Plaintiff has introduced no evidence indicating that Mr. King had any disciplinary history or that his Big Springs reference check was superior to hers. Indeed, it is undisputed that—unlike Plaintiff—Mr. King received no reference check from Associate Warden Ma'at. Suffice it to say that Mr. King is not a sufficient comparator to state a prima facie case of discrimination. Because Plaintiff has not presented evidence that any of the other males she

identifies in the record are any more similarly situated to her than Mr. King, Plaintiff has failed to make out a prima facie case of sex discrimination.

Without having made a prima facie case, Plaintiff may escape summary judgment only if she has presented "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)). Plaintiff may raise this inference through various forms of circumstantial evidence. But regardless of what type of evidence Plaintiff presents, it must be enough to "raise[] a *reasonable* inference that the employer discriminated against" her. *Id.* (emphasis added).

Plaintiff has put forth several pieces of circumstantial evidence that she argues could establish intentional discrimination by her superiors. First, as recounted above, she identifies statements made by both Warden Adduci and Associate Warden Ma'at as establishing discriminatory intent. Second, she emphasizes that Associate Warden Ma'at's statements came at a time when FCI Aliceville needed more female employees. And finally, she points to what she purports to be numerous falsehoods and inconsistencies in her promotion reference checks. Specifically, she argues that Warden Adduci and Associate Warden Ma'at falsified her reference checks by citing her pending disciplinary investigation and, in the case of Ma'at,

rating her skills in a manner inconsistent with prior performance reviews.

Upon review of the record, the Court finds that the evidence presented by Plaintiff is insufficient to allow for a reasonable inference that Plaintiff's superiors deliberately undermined her promotion efforts based on her protected status. As noted above, Warden Adduci's statement about Plaintiff's "time to promote" has no clear relation to her protected status whatsoever. To be sure, the record indicates that Associate Warden Ma'at once commented on Plaintiff's protected characteristics and recommended that she apply for promotion at FCI Aliceville. But there is no evidence that Ma'at—or anyone else at the facility—ever discouraged Plaintiff from seeking promotion outside of FCI Aliceville. Indeed, despite some evidence that FCI Aliceville needed more female employees, it is undisputed that existing female COs successfully transferred or promoted outside of the facility during this time.

Although there are numerous inconsistencies present in Plaintiff's reference checks, the reference checks still fail to show intentional discrimination. The applicable employment policy governing reference checks does not indicate that it is inappropriate to discuss a pending disciplinary investigation in a reference check. Thus, the fact that Warden Adduci and Associate Warden Ma'at sometimes referred to Plaintiff's open investigation does not prove that they falsely answered a question

regarding disciplinary actions taken. Indeed, Warden Adduci's reference to an "open case" made Plaintiff's disciplinary history clear to those reviewing the reference checks.[11] On the other hand, Associate Warden Ma'at's answers regarding Plaintiff's disciplinary history are less clear and are often inconsistent among reference checks. Furthermore, Ma'at's ratings of Plaintiff's job skills are less glowing than Plaintiff's performance reviews, to which Ma'at contributed on at least one occasion. And like his answers regarding Plaintiff's disciplinary history, Ma'at's ratings of Plaintiff's skills vary between reference checks. Overall, Ma'at's reference checks for Plaintiff are conflicting, but they do not demonstrate a deliberate effort to prevent Plaintiff from leaving FCI Aliceville. On almost every reference check he completed for Plaintiff, Ma'at affirmatively answered that he would employ Plaintiff in the position for which she was applying. Not once did Ma'at or anyone else at FCI Aliceville affirmatively answer that he or she would not employ Plaintiff in that position. In light of this record, it is not reasonable to infer that Plaintiff faced sex-based discrimination from her superiors.

Ultimately, Plaintiff's claim of discrimination rests on the strength of a single comment and certain inconsistencies in reference checks that ultimately

---

[11]     Given that Warden Adduci rated all of Plaintiff's skills as "Above Average" and affirmatively stated that she would employ Plaintiff for the position, the Court is skeptical of whether Adduci's reference check even qualifies as negative. (Pl's Ex. G.)

recommended Plaintiff for promotion. Her evidence simply does not support a reasonable inference in her favor. Accordingly, summary judgment is due to be granted for Defendant as to this claim.

## 2. TITLE VII RETALIATION

Plaintiff next brings a claim for retaliation under Title VII. 42 U.S.C. § 2000e–3(a). To make out a prima facie case for retaliation, she must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between her protected activity and her injury. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Defendant does not dispute that Plaintiff's communications with the EEO office in August 2015 qualify as protected activity under Title VII. *Johnson v. Booker T. Washington Broadcasting Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) ("Statutorily protected expression includes filing complaints with the EEOC . . . ."). The point of contention rests with the remaining two elements.

Plaintiff has alleged numerous acts of retaliation against her beginning shortly after she first contacted the EEO office in August 2015. These retaliatory acts include (1) the denial of Plaintiff's "in lieu of holiday" time in September 2015, (2) the reduction of Plaintiff's accrued annual leave while she attended a work-related training session, (3) the failure to pay Plaintiff overtime wages for her

attendance at a mediation session on November 23, 2015, despite HR Manager Tisdale's statement that such pay was warranted, and (4) the failure to investigate Plaintiff's allegations of harassment against Officers Hudson and Heatrice.[12] There is evidence in the record indicating that each of these alleged acts did occur.[13]

However, the Court may quickly narrow the field of alleged retaliatory acts to include only the failure to pay overtime wages for Plaintiff's attendance at the November 23 mediation. As part of her prima facie case, Plaintiff "must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997). However, Plaintiff has not demonstrated the point in time in which her superiors became aware of her

---

[12]     Plaintiff has alleged that the failure to respond to her complaints concerning Officers Hudson and Heatrice constitutes an attempt to retaliate against her by creating a hostile work environment. The Eleventh Circuit does recognize a cause of action for retaliatory hostile workplaces. *Gowski v. Peake*, 682 F.3d 1299, 1311–12 (11th Cir. 2012). As discussed below, however, the actions of Hudson and Heatrice are insufficient to create a hostile work environment, and Plaintiff therefore has not shown a retaliatory hostile work environment.

[13]     Defendant argues that he has foreclosed the possibility that Plaintiff's superiors retaliated against her through deliberate inaction in the face of her complaints against Officers Hudson and Heatrice. First, he cites Warden Adduci's declaration that she often sent supervising officers to the rear gate to resolve issues with Plaintiff. (Def's Ex. B at 5–6.) Second, he notes that Plaintiff herself concedes that her negative interactions with Hudson and Heatrice lessened or ceased outright following each initial confrontation. (Def's Ex. A at 145–46, 307.) However, Plaintiff testified in her deposition that no supervising officers ever spoke with her about the alleged harassment and that no threat assessment was ever conducted. (*Id.* at 144, 310–11.) Therefore, there is at least a fact question as to whether FCI Aliceville's management failed to respond to Plaintiff's complaints.

protected activity. The record indicates only that Warden Adduci became aware of Plaintiff's protected activity after she "was notified by the EEO counselor." (Def's Ex. B at 3.) As a matter of simple logic, Plaintiff's superiors must have been aware of her EEO activity at the time of the mediation conducted on November 23, 2015. As a result, Plaintiff's prima facie case may include the failure to pay overtime wages which occurred following that mediation. However, she has not presented sufficient evidence that would allow the Court to find that her superiors knew of her protected activity prior to the other alleged retaliatory acts. Therefore, the Court limits its consideration to the failure to pay overtime wages for Plaintiff's attendance at the November 23 mediation.

To show a causal connection between her protected activity and Defendant's failure to pay overtime wages, Plaintiff must present "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Southwestern Medical Ctr v. Nassar*, 570 U.S. 338, 360 (2013). In making a prima facie case, a plaintiff may demonstrate causation through a showing of "close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). If the plaintiff relies solely on temporal proximity to show causation, the proximity must be very close. *Id.* A gap of three to four months

between the protected activity and the adverse employment action does not imply a causal link. *Id.* In at least one non-binding case, the Eleventh Circuit has held that a gap of two months was close enough that a court could presume causation. *Robinson v. LaFarge N. Am., Inc.*, 240 F. App'x 824, 829 (11th Cir. 2007) (per curiam).

Here, Plaintiff first contacted the EEO office on August 21, 2015. Her superiors knew of her protected activity, at the latest, by the time that the parties participated in a mediation session on November 23, 2015. She has presented evidence that the denial of her overtime pay occurred on or around December 4, 2015. Thus, the temporal proximity between Plaintiff's protected activity and the first adverse employment action against her is close enough to satisfy the causal element of her prima facie case.

For a retaliatory act to qualify as an adverse employment action, it must be materially adverse such that it might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).[14] Here, HR Manager Tisdale indicated to Plaintiff and her

---

[14]   Defendant asserts that a claim of Title VII retaliation involving harassment also must demonstrate harassment that is "severe or pervasive enough to create an objectively hostile or abusive work environment." *Blackmon v. Wal-Mart Stores E.*, 358 F. App'x 101, 102 (11th Cir. 2009) (per curiam). Although such a requirement would apply in the case of a retaliatory hostile work environment claim, *see Gowski*, 682 F.3d at 1313, such a claim is not at issue in this case.

superiors that Plaintiff was entitled to two hours of overtime pay for her attendance at the November 23 mediation during her week off. However, Plaintiff represents that she never received this overtime pay. The denial of overtime pay could dissuade a reasonable worker, such as Plaintiff, from making a charge of discrimination. As a result, the failure to pay Plaintiff overtime qualifies as an adverse employment action, and Plaintiff has made her prima facie case of retaliation.

Because Plaintiff has made out her prima facie case, the burden now shifts to Defendant to demonstrate a legitimate, non-retaliatory reason for failing to pay two hours of overtime wages to Plaintiff for her attendance at the November 23 mediation session. *Johnson*, 234 F.3d at 507 n.6. Defendant argues that, notwithstanding HR Manager Tisdale's statements, Plaintiff was not entitled to overtime pay on this occasion. He notes that "overtime only applies when an employee has *worked* forty hours a week" and that "being on leave for forty hours does not entitle[] one to two additional hours of overtime." (Doc. 93 at 27.) As explained more fully below, Plaintiff has not demonstrated any legal entitlement to overtime wages under the FLSA. Therefore, Defendant has satisfied his burden of showing a legitimate, non-retaliatory reason for failing to pay Plaintiff overtime for her attendance at the November 23 mediation.

The burden shifts back to Plaintiff to demonstrate that Defendant's stated

non-retaliatory justification is pretextual. *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) ("The plaintiff must meet the reason proffered head on and rebut it."). To adequately show pretext, Plaintiff must "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). Plaintiff has not presented any specific policy by Defendant that would allow her to earn overtime wages even where the FLSA does not require them. To be sure, HR Manager Tisdale informed Plaintiff and her superiors that Plaintiff was owed overtime for her attendance at the November 23 mediation. However, HR Manager Tisdale's statements do not indicate the basis for her conclusion nor whether her conclusion accounted for the fact that Plaintiff had not worked at least forty hours during that work week. Without additional evidence concerning Defendant's overtime policies, a reasonable jury could not determine that Defendant's stated reasons for failing to pay overtime wages were pretextual. As a result, Plaintiff has failed to rebut Defendant's non-retaliatory justification, and summary judgment is due to be granted for Defendant as to this claim.

### 3. TITLE VII HOSTILE WORKPLACE

Plaintiff also brings a claim alleging that Defendant permitted a hostile work environment. Title VII protects an employee from hostility in the workplace that is based on a protected characteristic. *Gowski*, 682 F.3d at 1311. To establish a hostile work environment claim under Title VII, Plaintiff must show that (1) she belongs to a protected group, (2) that she has been subject to unwelcome harassment, (3) that the harassment was based on a protected characteristic, (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Plaintiff has failed to demonstrate a hostile work environment under Title VII. As evidence, she relies upon the harassment that she experienced from Officers Hudson and Heatrice after she refused them entry and exit through the facility's rear gate. However, Plaintiff has put forth no evidence that this harassment stemmed from any protected characteristic. *Id.* (hostile workplace claim requires "that the harassment must have been based on a protected characteristic of the employee, such as national origin"). Plaintiff admits that neither Hudson nor Heatrice made any reference to her sex nor used any sex-based slurs. The undisputed evidence demonstrates instead that any harassment that Plaintiff faced arose out of her

enforcement of workplace policy. Assuming that Plaintiff was correct in refusing to allow Hudson or Heatrice to pass through the rear gate on the dates in question, any resulting harassment is not actionable under Title VII.

Furthermore, Plaintiff has not shown any harassment that was "severe or pervasive." To satisfy this element, Plaintiff must show that her work environment was "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)) (internal citation omitted). The requirement that the harassment be "severe or pervasive" contains both a subjective and objective component. *Id.* at 1312. Thus, to be actionable, the behavior must result in an environment that (1) the victim actually perceives to be hostile, and (2) a reasonable person would find hostile or abusive. *Id.* In evaluating the objectivity requirement, the Eleventh Circuit has explained that courts should review the totality of the circumstances and consider: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or a "mere offensive utterance," and (4) whether the conduct unreasonably interferes with job performance. *Id.* "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount

to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)) (internal citation omitted).

Plaintiff's negative interactions with Officers Hudson and Heatrice do not meet the definition of "severe and pervasive." She had a single confrontation with Hudson, during which the latter yelled angrily at her and hit the rear gate. However, she did not feel physically threatened, and she has not shown that Hudson ever bothered her again. This single interaction does not satisfy any one of the four factors to be considered. Although Plaintiff had numerous negative interactions with Heatrice, those incidents cannot be considered severe and pervasive. In the first interaction, Heatrice yelled at her and blocked her office door when she attempted to leave. This confrontation caused Plaintiff to feel physically threatened. Afterwards, Heatrice never again yelled at Plaintiff, and he instead frequently acted standoffish and uncooperative when Plaintiff conducted checks of his vehicle at the rear gate. As with Hudson's behavior, Heatrice's behavior still does not rise to the level of "severe and pervasive" under Title VII. To be sure, his harassment of Plaintiff began more severely and lasted longer, but it quickly lessened to a series of personal slights that had little impact on Plaintiff's work environment. Given that these slights had nothing to do with Plaintiff's protected status, the Court finds that

a reasonable person would not have found this work environment to be abusive or hostile. Accordingly, summary judgment is due to be granted to Defendant as to this claim.

### 4. FAIR LABOR STANDARDS ACT

Plaintiff brings her final federal claim under the FLSA. 29 U.S.C. § 201, *et seq.* The FLSA requires employers to pay employees at least the minimum wage for all hours worked and, if no exemption applies, to pay an overtime rate for each hour worked in excess of the statutory minimum. *See* 29 U.S.C. §§ 206–07. Plaintiff claims that her superiors violated the FLSA by (1) deducting her accrued annual leave hours when she attended a required firearm training session in October 2015, and (2) refusing to pay her overtime wages for attending the mediation session scheduled during her week off work on November 23, 2015.

Defendant argues that Plaintiff's FLSA claim is time-barred. The FLSA requires that any action for unpaid wages must be brought within three years of a willful violation of the act. 29 U.S.C. § 255(a). Here, the reduction of Plaintiff's annual leave and the denial of overtime pay occurred on October 30, 2015, and shortly after November 23, 2015, respectively. Plaintiff filed her initial complaint on November 3, 2017. (Doc. 1.) Although her complaint referenced the failure to pay her in the context of retaliation, it did not expressly state a claim under the FLSA.

(*Id.*) She first stated a claim under the FLSA in her second amended complaint, which was filed on February 15, 2019. (Doc. 59.) Thus, more than three years passed between Plaintiff's injury and the filing of her second amended complaint expressly stating an FLSA claim.

Despite Plaintiff's delay in expressly stating an FLSA claim, her claim relates back to the filing of her initial complaint and therefore is not time-barred. Under the Federal Rules of Civil Procedure, an amendment relates back to the filing of the initial complaint where the amendment asserts a claim that "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." FED. R. CIV. P. 15(c)(2). As early as her initial complaint, Plaintiff alleged that her superiors unlawfully deducted her accrued annual leave and denied her overtime wages for attending the mediation session. (Doc. 1.) Because her FLSA claims arise from that same conduct, they relate back to the filing of that initial complaint on November 3, 2017. Plaintiff's claim therefore is not time-barred.

Although not time-barred, Plaintiff's claim arising from the reduction of her accrued annual leave is still due to be dismissed. The reduction of Plaintiff's accrued annual leave, even if wrongful, is not actionable under the FLSA. The FLSA expressly prohibits several types of acts but does not prohibit employers from reducing an employee's annual leave. *See* 29 U.S.C. §215(a); *Bolick v. Brevard Cty*

*Sheriff's Dept.*, 937 F. Supp. 1560, 1568 (M.D. Fla. 1996) ("All that the FLSA requires is that an employee be paid at least the minimum wage for all hours worked, and if no exemption applies, overtime pay for each hour in excess of the statutory minimum.").

Likewise, Plaintiff's claim for unpaid overtime wages is also due to be dismissed. Although the FLSA does prohibit an employer refusing to pay overtime wages where an employee is legally entitled, Plaintiff has not shown that she was legally entitled. Entitlement to overtime pay typically arises when an employee works more than forty hours in a single workweek. *See* 29 U.S.C. § 207(a)(1). If an employee does not work that number of hours, the employee is not entitled to overtime wages. 29 C.F.R. § 778.102; *see also Chavez v. City of Albuquerque*, 630 F.3d 1300, 1310 (10th Cir. 2011) ("It would be illogical to conclude that the FLSA would require overtime payments where, for example, an employee takes a full week's vacation but also does three hours of work."). Plaintiff has not shown that she worked more than forty hours during the week in which she attended the mediation session on November 23, 2015. Furthermore, she does not dispute that she received payment for the annual leave she used during that week. Accordingly, Plaintiff has not presented evidence of an FLSA violation, and summary judgment is due to be granted for Defendant as to this claim.

### 5. STATE-LAW CLAIM FOR INTENTIONAL INFLICTION OF EMOTION DISTRESS

Having disposed of all pending federal-law claims, the Court now turns to Plaintiff's remaining state-law claim for intentional infliction of emotional stress. Heretofore, the Court has exercised supplemental jurisdiction over this claim based on the Court's original jurisdiction over Plaintiff's federal law claims. 28 U.S.C. § 1367(a). Where the district court "has dismissed all claims over which it has original jurisdiction," the court may decline to exercise supplemental jurisdiction over any remaining claims. 28 U.S.C. § 1367(c). The Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004).

In granting Defendant's motion for summary judgment, the Court dismisses all pending federal-law claims. As a result, there are no remaining claims over which the Court may exercise original jurisdiction. The Court now declines to exercise supplemental jurisdiction over the remaining state-law claim against Defendant. Accordingly, the Court will dismiss that claim without prejudice.

Even if the Court did not decline to exercise supplemental jurisdiction, it would lack subject matter jurisdiction over Plaintiff's intentional infliction of emotional distress claim, because she has failed to exhaust her administrative

remedies with respect to such a claim. In a previous Order, the Court dismissed Plaintiff's claim for defamation based on this ground. (Doc. 73.)

"[T]he United States, as sovereign, is 'immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *Hercules, Inc. v. United States*, 516 U.S. 417, 422 (1996) (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)). The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–80, provides the exclusive remedy by which a plaintiff may seek redress for an alleged tortious action by the federal government or one of its agents. 28 U.S.C. § 2675(a). Plaintiff's state-law tort claim for intentional infliction of emotional distress falls under the FTCA and is thus subject to its requirements.

The FTCA establishes several conditions as precedents to suits against the United Sates. One such condition requires that, before filing suit against the federal government, a plaintiff must first "present[] the claim to the appropriate Federal agency." *Id.* The Supreme Court has established that a claimant may not institute an FTCA suit unless she has exhausted her administrative remedies through this process. *McNeil v. United States*, 508 U.S. 106, 112 (1993). When a plaintiff fails to exhaust her administrative remedies in an FTCA case, the court is deprived of subject matter jurisdiction. *See id.*

As with her earlier dismissed defamation claim, Plaintiff has failed to show that she exhausted her administrative remedies by submitting her state-law emotional distress claim to the relevant agency. Although she did make an EEO complaint in 2015 that referenced the actions alleged to have caused her emotional distress, her allegations were based on claims of sex discrimination and provided no notice of any action under the FTCA such that the United States would have received notice of her state-law emotional distress claim. Because Plaintiff has failed to fulfill the pre-filing procedural requirements of the FTCA, this Court lacks subject matter jurisdiction over her state-law emotional distress claim.

## IV.  CONCLUSION

For the reasons stated above, Plaintiff's motions (docs. 96 & 97) are due to be denied, and Defendant's motion (doc. 93) is due to be granted. Plaintiff's claims under Title VII and the FLSA are due to be dismissed with prejudice, and her state-law claim for intentional infliction of emotional distress is due to be dismissed without prejudice. An order consistent with this opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on March 3, 2020.

L. Scott Coogler
United States District Judge

199455
